UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

AMBER LYNN ZALEWSKI,

                              Plaintiff,

v.

                                                                **DECISION AND ORDER**

                                                                  15-CV-444

CAROLYN COLVIN, Acting
Commissioner of the
Social Security Administration,

                              Defendant.

---

## INTRODUCTION

       The parties have consented to my jurisdiction in this case pursuant to 28 U.S.C. §636(c). [14].[1] This is an action brought pursuant to 42 U.S.C. §405(g) to review the final determination of the defendant Acting Commissioner of Social Security that plaintiff was not entitled to Social Security Supplemental Security Income ("SSI"). Before me are the parties' cross-motions for judgement on the pleadings [9, 12].

       For the reasons stated below, this case is remanded to the Acting Commissioner for further proceedings.

---

[1] Bracketed references are to the CM/ECF docket entries.

## PROCEDURAL HISTORY

Plaintiff was born in 1985 (T. 122).[2] She asserts that she became disabled on September 9, 2011 (T. 122) due to back pain, a ruptured disk, a herniated disk, depression, post traumatic disorder, being emotionally disturbed, major depression, attention deficit disorder and spinal stenosis (T. 134). Plaintiff's work history reflects only brief employment at three jobs, either as a cafeteria aide or a cashier (T. 135). Her longest period of employment was for one month (T. 135).

Plaintiff filed an application for SSI on April 17, 2012[3] (T. 124). Her initial application was denied and an administrative hearing was subsequently held before Administrative Law Judge ("ALJ") Eric L. Glazer on March 14, 2013 (T. 30). On May 13, 2013, ALJ Glazer determined that plaintiff was not disabled (T. 25). The Appeals Council denied plaintiff's request for review on October 9, 2014, making the ALJ's determination the final decision of the Acting Commissioner (T.1-3). Plaintiff thereafter commenced this action.

## BACKGROUND

The record reflects that plaintiff had an extremely troubled childhood. In 1997, at the age of 12, plaintiff was raped by two teenage boys (T. 200). Later that same year, she was among several teenagers sexually abused in a pornography ring. Id. Plaintiff stated that she began to suffer depression after the exposure of her molestation in the pornography ring (T. 207).

---

[2] References denoted as "T" are to the transcript of the administrative record.

[3] Plaintiff actually submitted her application on May 18, 2012 (T. 122), however the parties agree that her protective filing date is April 17, 2012. Plaintiff's Memorandum of Law [9-1], p. 1; Acting Commissoner's Memorandum of Law [12-1], p. 2.

She became physically and verbally abusive toward her mother (T. 200). Her older brother was asked to move out of the house because of constant fights with plaintiff. Id.

A psychological evaluation completed on February 12, 1998, reflected that plaintiff had a full scale IQ of 74, which placed her in the borderline mentally retarded range of functioning (T. 202).

In September 1998, plaintiff was hospitalized for suicidal ideations after attempting to kill herself by self-mutilation (T. 200, 202, 207, 438). Although there are numerous references to this incident, documents relating to this hospitalization are not included in the record. It appears that plaintiff was subsequently prescribed Paxil for depression and provided with psychological counseling after this suicide attempt (T. 202). However documents relating to this treatment are not in the record.

During the 1999 school year she was determined to be "emotionally disturbed", affecting "her school performance as well as her social-emotional functioning inside and outside of her home environment" (T. 202). She was provided with counseling services, placed in special education classes, and allowed to attend school only from 11:00 a.m. to 2:45 p.m. (T. 201).

Notwithstanding these accommodations and counseling, plaintiff was a disruption in class, exhibited destructive and self-abusive behavior, and became aggressive with her peers and teachers. Id. This conduct led to multiple suspensions. Id. Plaintiff did not pass 10th grade and was told that she would have to repeat that grade in a residential program (T. 202).

Plaintiff was admitted to a residential treatment program in July 2001 (T. 207). The initial psychiatric evaluation by Dr. Aziza Karimi, dated August 9, 2001, stated that plaintiff's social withdrawal "had worsened to not wanting to leave home and clinging to parents". Id. She "cried constantly" as she told Dr. Karimi of her molestation and other

experiences (T. 208). Dr. Karimi noted that plaintiff "hears voices commanding her to do things she [does] not want to" (T. 207). Plaintiff was depressed, stated that she "wanted to die" and had severe insomnia. Id. Dr. Karimi also noted plaintiff's family history of schizophrenia. Id. He diagnosed plaintiff as suffering from "Major Depression Severe" and possible post-traumatic stress disorder ("PTSD") (T. 208). Her Global Assessment of Functioning ("GAF") was 40.[4] Id.

On November 1, 2001, Dr. Karimi noted that plaintiff's "social relation is improved" (T. 210). However, he stated that plaintiff complained of having a memory problem because although she understands what is taught during her classes, she cannot remember any of it the next day. Id. He continued her on Paxil. Id. Dr. Karimi's diagnostic impression was again major depression with "PTSD improving". Id.

By April 11, 2002, plaintiff, then 16 years old, was pregnant (T. 211). She told Dr. Karimi that her mother would care for the child after it was born. Id. The prescription for Paxil was discontinued due to her discharge from the residential treatment program and pregnancy. Id. She had been doing better in school, but was unsure whether she would pursue her education after her discharge. Id.

Plaintiff did not return to school. Between 2002 and 2012, plaintiff had five more children. Id. At the time of the hearing, their ages ranged from one to 11 (T. 35, 39). Four of the six children live with plaintiff (T. 38). Her oldest child lives with plaintiff's mother (T. 48).[5] Another child lives with his father in an apartment downstairs from plaintiff's apartment (T. 38).

---

[4] The GAF scale found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-4"), published by the American Psychiatric Association, states that a score between 31 and 40 reflects "[s]ome impairment in reality testing or communication (e.g., Speech is at times illogical, obscure or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., Depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)". DSM-4, p. 34.

[5] Plaintiff testified that her mother sought custody of the child in a Family Court proceeding, and that plaintiff did not appear in court to contest custody (T. 48).

Since 2002, there are several reports reflecting that plaintiff continued to suffer from depression and anxiety, and had been prescribed Paxil and Prozac by Dr. Rajeswara Nagalla, her treating internist (T. 232, 235, 250, 251, 254, 353, 398, 399, 400, 402, 403, 404, 405, 406, 407, 408, 409, 410, 411, 412, 413).[6] On multiple occasions, Dr. Nagalla referred plaintiff to a psychiatrist or a psychologist (T. 402, 403, 404), but the record does not include any reports reflecting that the plaintiff was seen by a psychiatric or psychological specialist since her discharge from the residential treatment program in 2002.

Plaintiff testified that she stopped going to psychological counselling after her first daughter was born in 2002 (T. 38)[7], but that she had started counselling again shortly before the administrative hearing in 2013 (T. 34). The record does not include reports relating to psychological counselling in 2013.

The bulk of the medical reports in the record relate to plaintiff's back impairment. On numerous occasions between 2009 and 2011, plaintiff sought medical attention due to back pain (*see i.e.* T. 217, 218, 251, 254, 253, 266, 284, 296, 335, 397, 398, 409, 410). Physical therapy (T. 213) and traction (T. 218) were employed but apparently did not resolve the issue. In addition to pain, plaintiff's symptoms included numbness in her lower extremities (T. 317).

An MRI performed on September 26, 2011 revealed "a very large posterior herniation . . . extending approximately 12 mm into the spinal canal mild inferior extension with severe impingement on the ventral thecal sac and traversing left L5 nerve root. Resulting severe central spinal stenosis is noted" (T. 241-42). The MRI also reflected a "large sequestered disc

---

[6] In addition to depression, Dr. Nagalla diagnosed plaintiff as suffering from "anxiety neurosis" (T. 398, 399, 400, 402, 403, 404, 405).

[7] Plaintiff testified that she "didn't have medical insurance for the longest [time]" so she stopped going to "counselling and everything" (T. 43-44).

fragment" at the L5-S1 level "severely impinging on the ventral thecal sac and the traversing left S1 nerve root" (T. 242). Spondylosis, posterior ridging and bulging were also noted. Id.

Plaintiff was advised that she required surgery on an "as soon as possible basis" (T. 348). A CT scan confirmed the ruptured discs at L4-L5 and L5-S1 (T. 320, 380). Dr. Jody Leonardo, a neurosurgeon, confirmed the need for surgery (T. 351) and performed a discectomy at L4-L5 on November 30, 2011 (T. 257).

After the surgery, plaintiff continued to report pain in her back and extremities. On December 15, 2011, she stated that the pain in her back was a 3 out of 10; and that the pain down her right leg was a 4 out of 10 (T. 503). On that same date it was noted that plaintiff no longer had radicular pain, but continued to have persistent numbness and tingling in the toes of her left foot and discomfort in both of her hips (T. 360).

On January 26, 2012, plaintiff reported that her pain had worsened to 5 out of 10 in her back, but she no longer had pain in her extremities (T. 508). Dr. Leonardo's report of that date reflected plaintiff's improvement, but noted that she continued to have "back discomfort" which was described as "mechanical back pain" (T. 362-63). Dr. Leonardo prescribed physical therapy for eight weeks (T. 363, 509).

Plaintiff continued to report back pain in March 2012 (T. 392), as well as pain in her back, hips and left leg in July 2012 (T. 513). Diagnostic imaging on July 23, 2012 revealed loss of disc height at multiple levels most marked in the lower lumbar spine which was characterized as a mild degenerative change. Id.

On June 18, 2012, Dr. Nagalla opined that plaintiff had decreased power in her left foot and that "movement" was painful "at L. S. spine" (T. 431). He stated that back pain would limit plaintiff's ability to push, pull and bend (T. 433) and to lift and carry things but did

not state any particular weight limitation (T. 432). He stated that the forward flexion of her hip was limited to 45 out of 100; and her hip abduction was limited to 10 out of 40 (T. 436). The flexion-extension of her lumbar spine was assessed at zero out of 90, and her lateral flexion was stated to be zero out of 25. Id.

By August 24, 2012, plaintiff reported that the pain in her back and in her right leg had worsened to an 8 out of 10 (T. 517). Dr. Leonardo noted that plaintiff has persistent numbness and tingling in the left lower extremity, but stated that plaintiff had improved remarkably (T. 518). Nevertheless, nine months after the surgery, Dr. Leonardo ordered an additional eight weeks of physical therapy (T. 474, 519).

The record does not include any reports from Dr. Nagalla after his June 18, 2012 residual functional capacity evaluation. The record does suggest that plaintiff continued to be followed by Dr. Leonardo's office. A radiology report, dated August 12, 2013, revealed "moderate severity disc degeneration" with mild bulging at L3-L4, L4-L5, L5-S1 (T. 527). On September 9, 2013, plaintiff was seen by a nurse practitioner at Dr. Leonardo's office who ordered another eight week session of physical therapy (T. 523).

## ANALYSIS

### A. Standard of Review

Plaintiff argues that the Acting Commissioner erred in finding that she was not disabled. The only issue I must determine is whether the Acting Commissioner's decision is supported by substantial evidence. See 42 U.S.C. §405(g); Rivera v. Sullivan, 923 F.2d 964, 967 (2d Cir. 1991). The Social Security Act states that, upon review of the Acting Commissioner's decision by the district court, "[t]he findings of the Acting Commissioner . . . as to any fact, if

supported by substantial evidence, shall be conclusive". 42 U.S.C. §405(g). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Company of New York. Inc. v. National Labor Relations Board, 305 U.S. 197, 229 (1938).

For purposes of entitlement to disability insurance benefits, a person is considered disabled when he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months". 42 U.S.C. §§423(d)(1)(A) & 1382c(a)(3)(A). Such a disability will be found to exist only if an individual's "physical or mental impairment or impairments are of such severity that [he or she] is not only unable to do [his or her] previous work but cannot, considering [his or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. §§423(d)(2)(A) & 1382c(a)(3)(B).

In order to determine whether plaintiff is suffering from a disability, the Acting Commissioner must employ a five-step inquiry:

> 1. The Acting Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Acting Commissioner considers whether the claimant has a 'severe impairment' which limits his or her mental or physical ability to do basic work activities.
>
> 3. If the claimant has a 'severe impairment,' the Acting Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Acting Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not 'listed' in the regulations, the Acting Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Acting Commissioner then determines whether there is other work which the claimant could perform.

The Acting Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. Talavera v. Astrue, 697 F.3d 145, 151 (2nd Cir. 2012); *see also* 20 C.F.R. §§404.1520, 416.920. However, the ALJ has an affirmative duty to fully develop the record where deficiencies exist. Gold v. Secretary, 463 F.2d 38, 43 (2d Cir. 1972); Swiantek v. Acting Commissioner of Social Security, 588 Fed.Appx. 82, 84 (2nd Cir. 2015).

If a claimant has a mental impairment, the ALJ must employ the "special technique" identified in 20 C.F.R. §404.1520a to evaluate the claimant's symptoms and rate the degree of functional limitation resulting from the impairment. 20 C.F.R. §404.1520a(b). In doing so, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the symptoms, and how a claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. §404.1520a(c). The ALJ must rate a claimant's degree of limitation in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. §404.1520a(c)(3).[8]

With respect to assessing limitations in the first three functional areas, a five point scale is used: none, mild, moderate, marked, and extreme. In the fourth functional area, a four point scale is used: none, one or two, three, four or more. 20 C.F.R. §404.1520a(c)(4). To satisfy

---

[8] These functional areas are also listed in §12.04B of the Appendix 1 listings and are referred to as the "Paragraph B criteria."

the Paragraph B criteria, the mental impairments must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.

A "marked" limitation means "more than moderate, but less than extreme"; one that "interferes seriously with [a claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C). "Repeated" episodes of decompensation means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks" or "more frequent episodes of shorter duration or less frequent episodes of longer duration" which are determined, in an exercise of judgment, to be "of equal severity". Id., §12.00(C)(4). *See also* Roach v. Colvin, 2013 WL 5464748, *8 (N.D.N.Y. 2013).

Where the ALJ determines that the claimant has a severe mental impairment, the ALJ must determine whether that impairment meets or equals a mental disorder listed in Appendix 1. 20 C.F.R. §404.1520a(d)(2). Mental impairments are addressed at §12.01 et seq. of the Appendix 1 listings. If the mental impairment is severe but does not meet or equal the Appendix 1 listing, the ALJ must consider any limitations resulting from the impairment when making a residual functional capacity assessment. 20 C.F.R. §404.1520a(d)(3). When the plaintiff's impairment is a mental one, special "care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g. speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such

work." *See* Social Security Ruling 82-62 (1982); <u>Farrill v. Astrue</u>, 486 Fed. App'x 711, 712 (10th Cir. 2012).

**B.   ALJ Glazer's Determination**

According to ALJ Glazer, the only severe impairments plaintiff suffered from was degenerative disc disease of the lumbar spine with lower back pain (T. 19). He found that plaintiff's mental impairments were controlled by medication alone. <u>Id.</u> In making this determination, ALJ Glazer did make findings under the Paragraph B criteria, stating that she has "mild limitations" in the areas of daily living, social functioning, and concentration, persistence or pace and has had no episodes of decompensation (T. 20).

ALJ Glazer stated that although plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms", plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms was "not entirely credible for the reasons explained in this decision" (T. 22). He determined that plaintiff has the residual functional capacity to perform a full range of light work (T. 21). He stated that plaintiff could "lift and/or carry and push and/or pull up to 10 pounds frequently and 20 pounds occasionally. <u>Id.</u>

**C.   Failure to Consider Borderline Intellectual Functioning**

Plaintiff argues that ALJ Glazer erred by failing to consider her borderline intellectual functioning in assessing plaintiff's limitations. Plaintiff's Memorandum of Law [9-1], p. 7. The Acting Commissioner asserts that plaintiff did not list her intellectual functioning as a disabling condition on her application, and that substantial evidence supports ALJ Glazer's determination. Acting Commissioner's Memorandum of Law [12-1], pp. 9-10.

While plaintiff did not list her diminished intellectual functioning as a disabling impairment on her application[9], this is not a case where the ALJ had no notice that plaintiff suffered from an intellectual deficit. Here, plaintiff listed "depression, post-traumatic stress disorder, emotionally disturbed, major depression and attention deficit disorder" among her impairments (T. 134). More pointedly, the record included reference to the fact that plaintiff's full scale IQ was assessed to be 74 placing her in the "borderline [mentally retarded] range of functioning" (T. 202).

The record also reflects that her limited intellectual functioning, as well as her various emotional impairments, required her to be placed in special education classes (T. 201). When special education classes proved insufficient, she was placed in a residential treatment program (T. 135, 202). She was discharged from this program after she became pregnant (T. 211).

While the record is not fully developed in this regard, there is at least a question as to whether plaintiff's diminished intellectual functioning played a role in the fact that she was unable to maintain employment as a cafeteria worker or a cashier for more than a one month period due to becoming "stressed out" (T. 134) and overwhelmed (T. 38). Clearly, her limited intellectual functioning could have played a role in the fact that plaintiff could not remember what people ordered while working at a Tim Horton's drive-through (T. 38, 135).

ALJ Glazer also found that plaintiff's mental impairments were controlled by "medication alone" (T. 19). However, he failed to consider whether plaintiff's limited intellectual functioning could also have played a role in the fact that she failed to seek treatment for her psychological impairments. Melia v. Colvin, 2015 WL 4041742, *2 (N.D.N.Y. 2015)

---

[9] The record does not reflect that plaintiff was represented by an attorney at the time she filed her application, which was only partially completed via the internet and required a telephone appointment for completion (T. 146).

(ALJ erred by failing to consider whether plaintiff's borderline intellectual capacity may have had an impact on the fact that she did not seek treatment as to her mental health impairments).

Reviewed as a whole, the record reflects that ALJ Glazer was aware that plaintiff had been determined to have limited intellectual functioning. His failure to consider that intellectual limitation when determining whether plaintiff suffered from a severe impairment or when assessing plaintiff's residual functional capacity and the Paragraph B criteria, requires that this matter be remanded for further administrative proceedings.

**D. ALJ Glazer's Assessment that Plaintiff can perform Light Work**

The plaintiff also argues that ALJ Glazer's assessment that plaintiff can perform a full range of light work is not supported by substantial evidence in the record. Plaintiff's Memorandum of Law [9-1], p. 10. The Acting Commissioner asserts that ALJ Glazer's determination is supported by substantial evidence. Acting Commissioner's Memorandum of Law [12-1], p. 12.

According to the regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities". 20 C.F.R. § 404.1567.

In addition, the capacity for a full range of light work also includes the ability to bend, kneel, crouch, and crawl. Butts v. Barnhart, 388 F.3d 377, 381 (2d Cir. 2004), as amended

on reh'g in part, 416 F.3d 101 (2d Cir. 2005). Indeed, in another case, the Acting Commissioner has acknowledged that "light work requires the ability to bend occasionally, meaning one-third of an eight-hour workday". Humes v. Colvin, 2016 WL 1417823, *2 (N.D.N.Y. 2016).

Here, as reflected above, plaintiff continued to complain of increasing back pain after her surgery in 2011 (T. 360, 503, 508, 513, 517). The most recent diagnostic imaging in the record reflected post-surgical bulging with "moderate severity disc degeneration" at several levels of plaintiff's lumbar spine (T. 527). These test results are consistent with Dr. Nagalla's opinion that plaintiff should "avoid bending, pushing and pulling" (T. 433). Dr. Nagalla also noted that plaintiff retained virtually no ability to bend forward or laterally (T. 436).

ALJ Glazer cites selectively from reports in the record which suggest that plaintiff's back impairment had improved (T. 22-23), but does not note reports that plaintiff's back pain had increased from a 3 out of 10 to an 8 out of 10 (T. 503, 517). Further, he mischaracterizes the 2013 imaging report as suggesting "minor to mild" degeneration (T. 23), when the report actually finds "moderate severity disc degeneration" (T. 527). Finally, ALJ Glazer also states that subsequent to the August 12, 2013 imaging report "there is no evidence of additional treatment" (T. 23), however, on September 9, 2013 Dr. Leonardo's office ordered that plaintiff submit to another eight week session of physical therapy (T. 523).

"It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports [his] determination, without affording consideration to evidence supporting the plaintiff's claims." Credle v. Astrue, 2012 WL 4174889, at *17 (E.D.N.Y. 2012). Moreover, ALJ Glazer fails to adequately account for Dr. Nagalla's opinion regarding plaintiff's limited ability to push and pull, and virtual inability to bend (T. 433). Indeed, although ALJ Glazer notes that Dr. Nagalla opined that plaintiff had "some limitation" with respect to her

ability to bend, he does not discuss Dr. Nagalla's highly restrictive range of motion assessment with respect to bending (T. 435) in any manner.

Because the ability to bend a substantial portion of the work day is required to perform a full range of light work, ALJ Glazer's determination in this regard is not supported by substantial evidence. I have already found that this case must be remanded to the Acting Commissioner for consideration of plaintiff's limited intellectual functioning. Also upon remand, the Acting Commissioner shall consider whether the plaintiff's pain and functional limitations due to her limited ability push, pull and bend allow her to perform substantial gainful activity.

## CONCLUSION

For these reasons, plaintiff's motion for judgment on the pleadings is granted to the extent that this case is remanded to the Acting Commissioner for further proceedings consistent with the above. The defendant's motion for judgment on the pleadings is denied.

So Ordered.

Dated: September 6, 2016

_____
JEREMIAH J. MCCARTHY
United States Magistrate Judge